ment found in the *Technical Tape Corp.* case is still accurate and authoritative:

> "The burden required of an importer seeking to overcome the presumption of correctness of the decision of the collector is to prove by a preponderance of the evidence that the collector's classification is incorrect, and that his sought classification is correct. He is not required to prove his case to a moral certainty or beyond a reasonable doubt." 55 CCPA at 42.

Nevertheless, as indicated previously, the state of the record in the case at bar is such as to satisfy an even more demanding standard than is required. The presumption of correctness has been overcome since plaintiffs have discharged "the burden of persuading the trier of the fact of the nonexistence of the presumed fact." Morgan and Maguire, *Looking Backward and Forward at Evidence*, 50 HARVARD L. REV. 909, 913 (1937). On the evidentiary effect of presumptions and burden of proof, see also Morgan, *Instructing the Jury upon Presumptions and Burden of Proof*, 47 HARVARD L. REV. 59, 83 (1933). Adopting the words of Mr. Justice Cardozo, "[t]he presumption does not consecrate as truth the extravagantly improbable." *Matter of Findlay*, 253 N.Y. 1, 8, 170 N.E. 471, 473 (1930) (presumption of legitimacy rebutted).

It is the determination of the court that the plaintiffs have borne their dual burden of proof in showing that the merchandise has been erroneously classified as screens, and that it is properly classifiable as "paintings" under item 765.03 of the Tariff Schedules of the United States. It is consequently entitled to enter duty free.

In view of the foregoing, the classification of the district director is set aside and the protest is sustained. Judgment will issue accordingly.

(C.D. 4214)

UNITED IMPORT SALES, INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided May 7, 1971)

*Glad & Tuttle* (*Robert Glenn White* of counsel) for the plaintiff.
*L. Patrick Gray III*, Assistant Attorney General (*Frederick L. Ikenson*, trial attorney), for the defendant.

Before RAO, Chief Judge, FORD and NEWMAN, Judges

NEWMAN, Judge: The merchandise in these two consolidated protests consists of bicycle generator sets imported from Japan and France during 1964–66 and entered at the port of Los Angeles, California. The importations were assessed with duty by the Government at the rate of 19 per centum ad valorem under the provision for "Other" illuminating articles in item 653.40 of the Tariff Schedules of the United States (TSUS).

Plaintiff has interposed two alternative claims:

Primarily, plaintiff asserts that each set was erroneously classified as an "entirety"; and that the generator included in each of the sets should have been individually assessed at the rate of 15 per centum ad valorem as "Other" electrical generators under item 682.60, TSUS.[1]

Alternatively, plaintiff claims that the sets are dutiable (as entireties) at the rate of 13.75 per centum ad valorem under the provision for "Other" portable electric lamps with self-contained electrical source in item 683.80, TSUS.

Other claims in the protests were abandoned at the trial and are hereby dismissed.

---

[1] Inasmuch as there was no separate appraisement of the generator in each set, plaintiff asks that the protests be remanded to a single judge so that a separate appraised value may be found for that article. See 28 U.S.C. § 2636(d).

THE STATUTES

Classified under:

Schedule 6, part 3, subpart F, Tariff Schedules of the United States:

> Illuminating articles and parts thereof,
> of base metal:

|         |  |  |  |  |  |  |  |
|---------|--|--|--|--|--|--|--|
| | * | * | * | * | * | * | * |

| | Other: | | |
|---|---|---|---|
| * * * | Table, floor and other portable lamps for indoor illumination, of brass___ | | * * * |
| 653.40 | Other _____ | 19% ad val. |

Claimed under:

Schedule 6, part 5:

> Generators, motors, motor generators, converters (rotary or static), transformers, rectifiers and rectifying apparatus, and inductors; all the foregoing which are electrical goods, and parts thereof:

|  |  |  |  |  |  |  |
|--|--|--|--|--|--|--|
| | * | * | * | * | * | * |

| 682.60 | Other _____ | 15% ad val. |
|---|---|---|
| | Portable electric lamps with self-contained electrical source, and parts thereof: | |
| * * * | Flashlights and parts thereof_____ | * * * |
| 683.80 | Other _____ | 13.75% ad val. |

THE RECORD

Plaintiff introduced in evidence the testimony of one witness, a collective exhibit, and the official papers; defendant offered the testimony of one witness. The facts are:

The generator sets are used on bicycles to provide illumination at night. The importations comprise two types of generator sets:

Those described as "No. 450 United generator set", or as "United wide beam generator set", or as "AP 3 Small Dynamo Sets", are basically the same type of sets and consist of a headlight, taillight, connecting wire, generator and a mounting bracket used for attachment of the generator to the front fork of the bicycle.

The second type of generator set (described on the invoice in red ink as "Dynamo lighting set") consists of a headlight connected to a generator by a bolt and nut, rather than by a connecting wire. However, the light and generator are not in the same housing.

Turning the front wheel of the bicycle activates a treadlike wheel attached to the generator, thereby producing electricity for the lights. The generator has a lever for positioning the treadlike wheel either in

an operating position against the front wheel of the bicycle, or in a non-operating position away from the bicycle wheel.

The lights, generator, connecting wire, etc. are always sold together as a set, and are used only in conjunction with each other. However, the lights in the set could be operated by another generator of the same voltage.

1.

The first issue to be resolved is whether the generator sets were properly assessable as entireties. In support of the collector's classification, defendant argues that "the sets are bought, sold, imported, and known as sets"; and that "the individual identities of the separate articles are subordinated to the identity of the combined entity". The Government relies on the holdings of our appellate court in *Lafayette Radio Electronics Corp.* v. *United States*, 57 CCPA 62, C.A.D. 977 (1970), and *Miniature Fashions, Inc.* v. *United States*, 54 CCPA 11, C.A.D. 894 (1966), in both of which cases the court found that the goods involved were entireties.

In *Lafayette*, the appellate court held that certain transistor radios with their leather cases were entireties. There, the court commented (*id.* at 66):

> * * * However, we find a significant fact in the present case which was not present in either *Hensel* or *Leitz*, namely, that the radios here can function and are designed to function *in the cases*. This fact tends to show that the radio and the leather case function as a unit, and when this is added to the facts of importation and sale as a unit, enhancement of appearance, and the functional contributions of protection and portability afforded by the case, we conclude that a proper showing has been made that the merchandise here should be treated as entireties. [Emphasis in original.]

In *Miniature Fashions, Inc.*, the appellate court held that "cabana sets" consisting of shirts and shorts were, under the facts presented there, dutiable as entireties. The evidence showed that the sets were designed as a unit, matched as to color, print and fabric, imported as a unit and pinned together, invoiced as a unit, and sold as a unit both at wholesale and at retail. It also appeared that when the shirts and shorts were separated and either part returned for credit, such part was either given to charity or placed in a wastebasket. The court concluded that the separate articles had no commercial value except when joined as a unit, and held that the possibility that the wearer might use either article separately or with another article of wearing apparel was not controlling as to the proper classification of the goods as imported.

Moreover, the court observed in *Miniature Fashions* that the doctrine of entireties was to be used as an aid to ascertain proper classifi-

cation and that, because of its scope, the doctrine can lead to two contrary conclusions depending upon what criteria are given controlling effect. As possible criteria, the court mentioned: "function", "use", "individual entities", "newly created entity", "intent", "design" or "commercial unit".

To buttress its position, plaintiff urges here that the generators included in the imported sets "are of the same character as batteries, which are not entireties with the articles which employ them as power sources, *United Merchandising Corp., Frank P. Dow Co., Inc.* v. *United States,* 48 Cust. Ct. 50, 54, C.D. 2313 (1962)".

In *United Merchandising Corp.,* the collector classified 600 dry cell 45-volt batteries under the *eo nomine* provision for batteries in paragraph 353 of the Tariff Act of 1930, as modified. Plaintiff contended that 500 of the batteries, which were imported with 500 radios, were properly dutiable as entireties under paragraph 353. The evidence showed that the batteries were made exclusively for the radios and were essential to their operation; further that the importer had purchased 600 batteries and only 500 radios, since the batteries were sold separately from the radios as "refills". This court held that the radios and batteries were not entireties, inasmuch as "the imported batteries, whether or not connected or joined to the imported radios, retain their identity as batteries" (*id.* at 54).

Although the question of what constitutes entireties has been determined in numerous cases, our appellate court admonished in *Lafayette Radio, supra,* that "there are no ironclad rules or universally applicable principles for determining whether merchandise should be classified as entireties" (57 CCPA at 66). In the present case, we are unable to conclude from the evidence presented or the holding in *United Merchandising Corp.* that the instant sets were erroneously classified as entireties.

Significantly, there is no evidence that the generator component of the sets was ever imported, bought, or sold separately as a replacement or otherwise. Indeed, by contrast, the batteries in *United Merchandising* were imported separately from the radios and sold as "refills". The lights can not function without the generators, and absent the lights the generators serve no purpose. Consequently, there is no basis for finding that the generators could be sold as separate articles, or that they had any separate commercial value.

In short, the components of the set were designed to be used and were useable only as a unit. This vital fact, coupled with the exclusive importation and sale as a unit, justifies classification of the sets as entireties. The generators, accordingly, are not separately dutiable under item 682.60, TSUS, as primarily claimed by plaintiff.

2.

In view of our finding above, we must now consider plaintiff's alternative claim under item 683.80, TSUS.

Defendant does not dispute that the generator sets have a "self-contained electrical source" within the purview of item 683.80, TSUS, but rather defendant disputes only that the merchandise is "portable". Both parties quote the following definitions of the term "portable":

> *Webster's Third New International Dictionary* (1961):
>
> portable 1: capable of being carried: easily or conveniently transported: light or manageable enough to be readily moved (a ~ grill) (a ~ power drill) [at 1768]
>
> *Random House Dictionary* (1965):
>
> portable 1. capable of being transported or conveyed: a portable stage. 2. easily carried or conveyed by hand: a portable typewriter. * * * [at 1120]
>
> *Funk & Wagnalls New Standard Dictionary* (1965):
>
> portable 1. That may be readily carried by or with one from place to place, or readily transported from one place to another. * * * [at 1934]

If the above-quoted definitions were applied literally, it is apparent that every imported article, at the time of importation, is "portable" in the sense that it is "capable of being transported or conveyed". Clearly, Congress did not intend the term "portable" in item 683.80, TSUS, be given such broad construction. Indeed, the generator sets were not "carried" or "transported" on bicycles, but rather were attached thereto so as to become part of the bicycle's permanent equipment. It would be anomalous to say that a bicycle is carrying or transporting part of itself. Hence, the generator sets are not portable lamps any more than radios designed for installation in automobiles are portable radios.

Additionally, the parties agree that "the actual origin of item 683.80 must have been heading number 85.10 of the Brussels Nomenclature", which reads:

PORTABLE ELECTRIC BATTERY AND MAGNETO LAMPS, OTHER THAN LAMPS FALLING WITHIN HEADING No. 85.09.[2]

The scope of heading 85.10 is discussed in *The Explanatory Notes to the Brussels Nomenclature* (1955), Vol III, wherein the following appears, at 939:

---

[2] Heading 85.09 provides for: "ELECTRICAL LIGHTING AND SIGNALLING EQUIPMENT AND ELECTRICAL WINDSCREEN WIPERS, DEFROSTERS AND DEMISTERS , FOR CYCLES OR MOTOR VEHICLES".

This heading covers portable electric lamps designed to function by means of a self-contained source of electricity (e.g., dry cell, accumulator or magneto).

They comprise two elements (i.e., the lamp proper and the source of electricity) which are usually mounted and directly connected together, often in a single case. In some types, however, these elements are separate and are connected by wires.

The term "portable lamps" refers only to those lamps which the user may move at will (i.e., both the lamp and its electricity supply) without the need for some means of transport. *The term therefore excludes* inspection lamps and the like which are connected to a fixed installation (heading 83.07), and *lighting equipment for motor vehicles and cycles* (heading 85.09).

The lamps falling within the present heading include:

(1) Pocket lamps. Some ("dynamo lamps") are operated by a magneto, hand driven by means of a spring-loaded lever.

(2) Other hand lamps (including those with an adjustable beam). Hand lamps are often fitted with a simple device for hanging them temporarily on a wall, etc., while others are designed so that they can be placed on the ground.

(3) Morse signalling lamps.

(4) Miners' safety lamps; the lighting device is usually designed for fitting to the miners' helmet, while the source of electricity (accumulator) is usually hooked on to the belt.

(5) Examination lamps for general use, fixed to a headband (which usually consists of a curved strip of metal). Such lamps are classified here only if they have their own source of current (dry battery in user's pocket, for example) ; the heading does not cover those designed for connecting to an installation. The lamps of the present heading are used by doctors, watchmakers, jewellers, etc. Specialized medical inspection lamps (e.g., for throat or ear inspection) are excluded (heading 90.17).

(6) Fancy torches in the shape of pistols, pens, etc. Composite articles composed of a lamp or torch and a pen, screwdriver, key ring, etc., remain classified here only if the main function of the whole is the provision of light. [Emphasis added.]

Thus, heading 85.10 excludes lighting equipment for motor vehicles and cycles; such equipment is covered by heading 85.09. However, independent of any insight into Congressional intent which may be gleaned from the Brussels Nomenclature, we do not believe Congress intended that item 683.80 should embrace lighting equipment designed to be affixed to bicycles.

Finally, plaintiff contends that item 683.80 was intended to cover the generator sets inasmuch as item 683.65 [3] (which provides for electrical lighting equipment designed for automobiles, but not for bicycles) is more limited in its scope than heading 85.09 of the Brussels Nomenclature. We find this contention to be entirely without merit.

In view of the foregoing, plaintiff's claim under item 683.80 is overruled.

Judgment will be entered accordingly.

(C.D. 4215)

---

[3] Section 36(h) of the Tariff Schedules Technical Amendments Act of 1965, Public Law 89–241. 79 Stat. 933.